IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

DAVID CHARLES BARNES, SR.                                  PLAINTIFF

                v.                            Civil No. 04-2285

CRYSTAL REED, Jail Nurse                                      DEFENDANT

## **MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

David Charles Barnes, Sr., a former inmate of the Sebastian County Detention Center, brings this pro se civil rights action pursuant to 42 U.S.C. § 1983. During his incarceration at the Sebastian County Detention Center, Barnes contends his constitutional rights were violated because he was denied adequate medical care.

On December 14, 2005, an evidentiary hearing was held. At the conclusion of the hearing, the undersigned took the case under advisement pending preparation of this report and recommendation.

### **I. BACKGROUND**

At the hearing, the court heard the testimony of the following witnesses: (1) David Charles Barnes, Sr., the plaintiff; (2) Charlie Rye, Jr.; (3) Miguel Meza; (4) Gayla Jackson; and (5) Crystal Reed, the defendant. For purposes of discussion, we will summarize in the first person the testimony of these witnesses.

AO72A
(Rev. 8/82)

*Testimony of David Charles Barnes, Sr.*

I'm forty-eight years old. I was booked into the Sebastian County Detention Center (SCDC) on November 6, 2004. I was convicted on October 13, 2004. I was in the SCDC serving time awaiting transfer to the Arkansas Department of Correction (ADC).

My wife brought prescription medication to the jail the day after I got there, Neurontin and Dilantin. The medication was for a seizure disorder.

I was drawing Social Security disability for the disorder for six years. Dr. William Griggs told me I had seizure disorder. As far as I know, when I have seizures I just black out. My wife says I black out and go into convulsions.

I still have some seizures even though I take the medication. I've taken medication the whole six years since I was told I had it. In the past year, while I have been in the ADC, I've had three seizures. When I was free, I had five or six seizures a year. You can't completely control the seizures even with the medication.

When I first started going to Dr. Griggs his nurse got me on an indigent program. You get a three month supply of medication. When I got down to the last month, the manufacturer was contacted and it would send another supply to Dr. Griggs' office. His office contacted the manufacturer.

When my wife brought the bottles to the SCDC, I don't believe the bottles had any labels on them. I didn't know the pills were discolored. I believe I tore the labels off and wrote the doseage on them. The medication came with a label that just said what type of medication was in the bottle. It didn't have my name or anything on the bottle.

2

I haven't seen Dr. Griggs since 2000 or 2001. I got the medication through the nurse. I just had to call her and she would order it. It probably wasn't supposed to be ongoing. Dr. Griggs fired me as a patient because I forged his name to a prescription. The nurse continued to get my medication for me anyway.

After I was booked into the SCDC, I just knew I wasn't getting my medication. Around November 8th or 9th, I started asking for the medication. I sent requests in but I was never seen by Nurse Reed. I couldn't tell you what she looks like. I talked to the guards and they would bring back my grievances.

I came to jail from the hospital. I was on methamphetamine. I had a wreck. The first day or two I was at the SCDC, I don't remember a thing. If Nurse Reed saw me, it had to have been within the first two days. I was picked up by the Arkoma Police Department and taken to Sparks Regional. I told the emergency room personnel that I had a seizure disorder. They didn't prescribe medication. I have a twenty-two year history of IV methamphetamine use. I admitted this in the Sparks' records and the ADC records.

I don't know why the Sparks' records would show my Dilantin level was zero. I had been taking my pills.

I have had hundreds of seizures. I didn't have more seizures while I was in Dr. Griggs' care. My fiancee did not tell Dr. Griggs that I was having more seizures. I don't know why the records say that. Dr. Griggs wouldn't see me any more because I forged his name. Dr. Griggs is the one who got me Social Security in 1999. He went to court with me when I got disability.

AO72A
(Rev. 8/82)

On November 8, 2004, I was asked to sign a release so the nurse could get my medical records. *Defendant's Exhibit* 1 at page 4. I was also sent a medical charge sheet asking for information about my "meds and doctor," the name of the clinic, and pharmacy. *Deft's Ex.* 1 at page 2. I wrote Griggs & Griffin for doctors, AHEC for clinic, and Anderson for pharmacy. I was treated by Dr. Griffin at the AHEC clinic for Hepatitis. *Id.* I knew the pills didn't come from Anderson Pharmacy. I thought they were asking me what pharmacy I used. I didn't think they were asking what pharmacy the pills came from.

The form was sent back again asking where the bottles of meds came from. I responded: "The medicines came from Dr. Griggs office, the indigent program, I get them in 3 month supplies. Dr. William Griggs Office." *Deft's Ex.* 1 at page 3. The nurse responded that I had been fired from Dr. Griggs' office over a forgery and had not seen him since 2000. On November 9th, I got the form back and the nurse said I would need someone to send me $60 to see the doctor or wait until I got to the ADC to be evaluated. *Plaintiff's Exhibit* 2. I received this note but frankly I don't recall ever talking to the nurse. The nurse didn't give me the medicine.

I was property of the ADC at the time. I don't know if I had $60 in my commissary account then. I did have some money on the books. It looks like $10 got deducted from the books as a result of the nurse checking on my medication. *Plff's Ex.* 2. When I went to the ADC on January 2nd, I had $130 on my books. Now I'm in the ADC, I don't have to pay for my medicine.

On November 10th, I filled out a grievance form. I stated my wife had brought my Dilantin and Neurontin and I couldn't get it. *Plff's Ex.* 1 at page 1. I indicated Dr. Griggs had

4

dropped me but my meds still came through the indigency program I was on through his office. *Id.* I stated that the pharmaceutical company sent them in three month supplies. *Id.* I also said that Dr. Griffith at AHEC was for my Hepatitis. *Id.* In response, I was told I would not receive the meds because they were not in the correct bottles. I was told to fill out a medical slip.

I guess I was asking them to provide me my medication. I believe I filled out other forms asking again for my medication. I don't know how many. I spoke to the guards about needing my medication. I knew the nurse called the shots. To see her you needed to fill out a sick call slip.

I probably don't have a slip asking to see a doctor. They had told me I had to pay $60 or wait until I got to the ADC. The SCDC knew I had been to the emergency room. I came to the SCDC in a hospital gown. I was doped up on Ativan. The hospital gave me this to bring me off of the high from methamphetamine. The Fort Smith police picked me up at the hospital.

I was in a cell with twenty-one men. I don't know what happened during the seizure. I was told I had one. It was during the last part of November or the first part of December. I was helped up and taken to holding cell one. I was taken back to my cell the next day. Everyone was told that Reed said I did not have seizure disorder and I was suffering methamphetamine withdrawal. Frankie Stamps, a deputy, told the inmates that Reed said the only thing wrong was I was having withdrawal from methamphetamine.

I fell out of a truck twenty years ago. I still have scar tissue on the right side of my brain.

I was at the SCDC for two months. I got to the ADC on January 2nd. When I got there, they asked me what medications I was on and why I was on the medication. I was given the

medication right away. I started on them on January 3rd and am still taking them today. I have had seizures while at the ADC.

I've been incarcerated at the SCDC on other occasions. I was there in August of 2004 for six days. The jail supplied my medication that time. They asked me what medication I took. I wrote it down and they supplied it.

Every other time I was in the SCDC I received my medication. I don't know if my wife gave the medication to the jail or not. Officer George Lawson made sure I got my medication. He was a detective. He has gotten me out of jail. He had to be the one helping me. He knew about my medication and where it was coming from. I didn't see the medication bottles during my earlier incarcerations.

### *Testimony of Charlie Rye, Jr.*

I'm currently an ADC inmate. I was at the SCDC the full length of Barnes' incarceration there. I was there from January of 2004 until January 3, 2005.

After Barnes was there about a month, I observed him have a seizure. Before he had the seizure, he was "drawing up." His muscles were stiffening. We said he needed help. He did that for two or three days and then he went into a full seizure. He was flopping on the ground. Stamps took him off.

We assumed Barnes had been taken to the nurse. Stamps told us that Barnes was just having methamphetamine withdrawal.

When Barnes had his seizure, Reed was off on maternity leave. There was only one nurse. The night shift was not covered. Barnes was not taken to see the nurse the next day.

AO72A
(Rev. 8/82)

The first four or five days Barnes was there he was severely out of it. He didn't know his own name.

You would ask for a grievance or a medical request form and the guards wouldn't have them. It was somewhat difficult to get them. The guards would wad them up in front of you.

I think I saw Reed twice. Once when I first got there and then for an ear infection. When I saw the nurse it was in response to submitting a medical request. It took me almost two weeks to get a medical slip.

I'm not a nurse or a doctor. I have no medical training.

I have used and sold methamphetamine. You don't have withdrawal after a month. Withdrawal symptoms last about a week but your body never goes back to the way it had been.

I never met Barnes before we were in the SCDC together. I don't know how frequently he had seizures.

The first month or two he was at the ADC, he had several seizures until they got his levels built back up. Until two or three weeks ago, I was in the same barracks with Barnes. We were next door to each other. Now I'm in the next barracks over from Barnes at the ADC. I see him two or three minutes at chow, through plexiglass. As far as I know, he hasn't had a major seizure in awhile.

### *Testimony of Miguel Meza*

I'm an ADC inmate. I was housed with Barnes at the SCDC.

When Barnes first came in, he was not really there. He looked bad–kind of sick. He had just gotten out of the hospital. He didn't look like a normal person.

7

AO72A
(Rev. 8/82)

I saw him one time laying on the floor shaking. The guard to him to the infirmary room. He stayed there one night and then he came back. He was still real bad.

Barnes asked the guards for medicine sometimes. I heard Stamps say that Barnes was doing methamphetamine.

### *Testimony of Gayla Jackson*

I'm the assistant administrator at the SCDC. The policy regarding medical care is that except for emergency situations, inmates need to fill out a nurse call sheet or medical care form. The inmates get the forms from the deputies or sometimes if the individual has a problem when being booked in they will ask booking for a form. If an inmate asks for a form, the inmate is given it.

All medical call slips are responded to by the medical staff, the nurses. Our policy is that the inmates have a co-pay of $10 for each nurse's visit or request form. If an inmate cannot pay, the co-pay is charged to the inmate's commissary account and a negative balance is reflected. If the inmates receives money, it is charged to medical.

There are no medical call slips from Barnes or Rye regarding Barnes having seizures. Inmates are informed of the medical care policy at intake and it is posted in the pod.

On November 9, 2004, plaintiff was told he would need someone to send him $60 to see the doctor or wait until he got to the ADC to be evaluated. *Plff's Ex.* 2. This statement makes it sound like he can't see the doctor without $60. I don't know the nurse's intentions.

An inmate is charged $60 to go to the doctor. However, it is not jail policy that the inmate must have money to go to the doctor. We have people who see the doctor who don't have

money right then. We may call an inmate's family and ask them to send the money. If they really need some necessary medical attention, they don't need to wait until they get $60.

### *Testimony of Crystal Reed*

I'm a registered nurse. I wrote the statement that he would need someone to send him $60 to go to the doctor or wait to be evaluated when he went to the ADC. *Plff's Ex.* 2. If inmates do not have the money to pay for a doctor visit, the fee is charged to their account and a negative balance is shown.

I could have worded this differently. I probably should have referred back to the indigent statement at the top of the page.

November 8th is the first I knew about the medications. I requested more information from Barnes. I had the bottles of medicine. I sent the form to Barnes requesting information about the medication, his doctor, the clinic, and the pharmacy. Barnes responded to my questions.

Once I got his response, I would have called the clinics and the pharmacy and asked when the medication had last been prescribed or obtained. I needed the information because the pill bottles did not have the information on them. The bottles only had a manufacturer's sample label. The labels did not contain Barnes' name or the doseage he was on.

We have to count pills and verify the pills are all the same. The medication also has to be that inmate's before we will give it to him. Dilantin is usually purple and white or orange and white. The pills Barnes had were neither. They were discolored. The discoloration means they had either been tampered with or they were very old.

9

I called the doctors' offices and the pharmacy. Anderson Pharmacy had no records for Barnes. There were no doctors by the name of Griggs or Griffin at AHEC. AHEC is a traning facility. Dr. Griffin may have been there for a period of time. I didn't recognize Dr. Griggs' name at the time.

I asked Barnes for information again. I don't recall seeing Barnes personally. I just recall doing the follow up.

Barnes said the medications came from Dr. Griggs and Barnes got them in a three month supply. Dr. Griggs' office indicated they had fired Barnes as a patient over a forgery on June 28, 2004. November 22, 2000, was the last time Barnes was seen in the clinic. Doctors do not normally continue prescibing medication for patients who don't come in. I don't recall who I talked to–probably someone at the reception desk. I was not told that Barnes was prescribed Dilantin and Neurontin.

A medical release for Barnes' records from Dr. Griggs' office was faxed on November 8th by C. Collier. Collier is a licensed practical nurse. She is the other nurse at the jail who works at night. We didn't receive the records until a later date. The records were received on January 14, 2005, *deft's ex.* 3, last page. This was after Barnes was transferred to the ADC.

On December 1, 2004, I had a baby. I went on maternity leave. I did not return to work until the last week in January of 2005 or the first week in February.

When I came back to work, I saw Dr. Griggs' records had come in. *Deft's Ex.* 3. This was the first time I found out Barnes had been prescribed Dilantin and Neurontin. Dr. Griggs' records indicate Barnes had more seizures when he was on medication in 1999 and 2000 than he had when he was off the medication. *Id.* The records also indicate Barnes had forged Dr.

10

AO72A
(Rev. 8/82)

Griggs' signature on a Social Security disability application saying that Barnes had seizure disorder. *Id.*

In the past week, I looked at the records from Sparks. Barnes did not tell me he had been hosptialized.

The Sparks' records indicate he complained of a seizure disorder. *Deft's Ex.* 2 at page 6. Sparks did not prescribe any medication. Barnes admitted to methamphetamine use. *Id.* The blood tests done at Sparks shows Barnes' Phenytoin level was zero. *Deft's Ex.* 2 at page 12. Phenytoin is another name for Dilantin. For Dilantin to prevent seizures there has to be a certain level of it in the blood. The level would not be zero if Barnes had been taking Dilantin.

There is a range at which the level should be maintained. The Sparks laboratory analysis lists the reference range as 10 to 20 micrograms per miloliter. *Deft's Ex.* 2 at page 12.

The ADC records indicate Barnes is on Dilantin. *Deft's Ex.* 4. Barnes has continued to have seizures. *Id.* His Dilantin level is 5.2. I don't know how long it would take to get the Dilantin level up to normal levels. I don't know how long it would take to get the Dilantin level up to the 10 to 20 level. I don't know if the machine used at Sparks was calibrated the same as the one that did the analysis for the ADC.

## II. DISCUSSION

A convicted inmate's claim of inadequate medical care is analyzed under the deliberate indifference standard. *Hall v. Dalton*, 34 F.3d 648, 650 (8th Cir. 1994). To prevail on an Eighth Amendment claim, Barnes must prove that the defendant acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference standard includes "both an objective and a subjective

11

AO72A
(Rev. 8/82)

component: '"The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs."' *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)).

When being booked in, Barnes advised jail personnel that he had a seizure disorder and took two medications, Dilantin and Neurontin, on a daily basis. His wife brought the medications to the jail the following day.

Because the pills were in bottles not bearing a label with Barnes' name, the doctor who prescribed the medication, or the doseage, and the pills appeared to be discolored, Nurse Reed sent a series of written questions to Barnes. *Deft's Ex.* 1 at page 2. Barnes responded to the questions in writing and Nurse Reed made inquiries from the clinic and pharmacy he identified. *Id.* Her inquiries resulted in her being told there were no doctors by the names of Dr. Griggs or Dr. Griffin at the clinic and the pharmacy had no recrods on Barnes. *Id.*

Nurse Reed then sent another written request for information to Barnes. *Deft's Ex.* 1 at page 2. She advised him the pharmacy had no records on him and that the clinic had no doctors by those names. *Id.* She then asked him to state where the bottles of medication came from. *Id.* Barnes responded by stating the medication came from "Dr. Griggs['] office, the indigent program, I get them in 3 month supplies." *Id.* at page 3. Nurse Reed followed up on this and was told Barnes was last seen by Dr. Griggs in 2000 and had been fired as a patient over a

12

forgery in June of 2004. *Id.* at pages 2 & 3. Barnes' records were also requested from Dr. Griggs' office.

After informing Barnes what she had been told by Dr. Griggs' office, Nurse Reed informed Barnes in writing that he would not be given the medication and would "need someone to send [him] $60 to see the doctor or wait til [he got] to ADC to be evaluated." *Deft's Ex.* 1 at page 2; *Plff's Ex.* 2. At the top of this same form, immediately above Barnes' signature the following statement is written: "I understand that the co-pay fees will be deducted from my commissary account for each service requested/rendered. If I am indigent I understand a negative balance will be placed on my commissary account awaiting funds. Appointments made prior to incarceration will need to be canceled or rescheduled by nurse." *Id.*

The court is troubled by the wording of Nurse Reed's statement that Barnes needed someone to send him the $60 to see the doctor or wait until he got to the ADC to be evaluated. Certainly, this statement suggests that without funds there is no access to a doctor. However, under the facts as testified to at the hearing, we find plaintiff has failed to establish deliberate indifference on the part of Nurse Reed.

Barnes was booked in on November 6th. On November 7th, his wife brought the medication to the SCDC. On November 8th, Nurse Reed was following up on the medication and attempting to verify that Barnes had a valid prescription for the medication and what doseage he was on. She sought additional information from him and followed up on all information given her by Barnes.

Nurse Reed discovered Barnes had not been seen by Dr. Griggs since 2000. Her testimony that doctors do not normally prescribe medication for patients who they are not

13

currently seeing was uncontradicted. In fact, Barnes even testified it was probably not right that he was still getting the medication through the indigency program by contacting an unidentified nurse at Dr. Griggs' office. Barnes did not provide Nurse Reed, or the court, with the name of the nurse at Dr. Griggs' office who he contacted to obtain his pills.

While Barnes testified Nurse Reed should have known he came to the SCDC directly from the hospital, she testified she did not know this. Even if she had this information, the records from Sparks indicate Barnes' Dilantin level was zero. While Barnes maintains he was taking the medication and asserts that this could not be accurate, the fact is that is what the records, had they been examined by Nurse Reed, would have revealed. Additionally, Sparks did not prescribe or provide Barnes with Dilantin or Neurontin.

Although Nurse Reed informed Barnes he would have to pay to see the doctor or wait until he got to the ADC, it is undisputed that the same form stated that if the inmate is indigent a "negative balance will be placed on [his] commissary account awaiting funds." Although Barnes knew that access to medical care was through the nurse, he made no written request to see a doctor so that he could obtain prescriptions for the medications. In fact, after the one grievance submitted by Barnes on November 10th, *plff's ex.* 1, no other grievances or medical requests appear in the record.

When he had his seizure, Nurse Reed was on maternity leave. It appears she had no further interaction with Barnes. We do not believe on these facts that Nurse Reed was deliberately indifferent to Barnes' serious medical needs. *Tlamka v. Serrell*, 244 F.3d 628, 634-635 (8th Cir. 2001)(deliberate indifference shown when an official intentionally delays providing an inmate access to medical treatment knowing the inmate has a life-threatening condition or an

14

AO72A
(Rev. 8/82)

urgent condition that will be exacerbated by delay); *Miller v. Schoenen*, 75 F.3d 1305, 1309 (8th Cir. 1996)(to establish deliberate indifference, inmate must show both that he had objectively serious medical need and that defendants knew of and disregarded the need).

### III. CONCLUSION

I therefore recommend that judgment be entered in the defendant's favor and this case be dismissed.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 20th day of January 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)